UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| VERONICA DURAN MARTINEZ,<br><br>    Plaintiff,<br><br>    v.<br><br>THE CITY OF AUBURN, and DOUGLAS FAINI,<br><br>    Defendants | CASE NO. C06-0447-JCC<br><br>ORDER |

This matter comes before the Court on Defendants' Motion for Partial Summary Judgment on Plaintiff's Constitutional Claims (Dkt. No. 21). Having considered the memoranda, exhibits, and declarations submitted for and against the motion, the Court hereby finds and rules as follows.

**I.   Background**

The present case involves an altercation between police and a suspected drug dealer, Cristino Vargas, that resulted in an officer shooting into a car, killing Vargas and injuring another person, Plaintiff Veronica Martinez. Vargas's estate sought relief under 42 U.S.C. § 1983 in a separate action, which has been resolved. *Estate of Vargas Mendoza v. City of Auburn*, C06-0455-JCC (W.D. Wash.).[1] Here,

---

[1] That matter involved the same Defendants as the present case.

ORDER – 1

Martinez alleges that the shooting violated her constitutional rights, and seeks relief under 42 U.S.C. § 1983 and state tort law. At the present time, Defendants seek summary judgment only as to her constitutional claims.

On April 1, 2003, Drug Enforcement Administration ("DEA") agents and the City of Auburn Police together identified Cristino Vargas as a suspected drug dealer. A lower-level dealer, Tanya Marie Simpson, had identified her crack cocaine source as "Chris," who she described as a short Hispanic male who drove a green SUV with dark tinted windows and lived in Federal Way. She told the detectives that he was on his way to her location, which was a motel in Kent, Washington. Detectives set up surveillance and waited. A green Chevrolet Tahoe with dark tinted windows drove through the parking lot of the motel and left without stopping. The detectives presumed that the driver had become suspicious and left.

DEA agents arranged with the Auburn Police Department to have the green SUV stopped by marked police cars, including Defendant Sergeant Doug Faini's police dog unit and Auburn Police Officers Melton and Smith. Plaintiff was a passenger in the car when it was stopped. A digital police video recording of the stop was submitted with Defendants' motion (Dkt. No. 25 (Ashbaugh Decl. Exh. 2)). The Supreme Court has recently endorsed reliance on such forms of evidence, *Scott v. Harris*, 127 S. Ct. 1769, 1775-76 (2007), so the Court outlines the events that lead to the shooting as shown in the video or as otherwise undisputed.

The video begins with the stop at approximately 6:20 p.m. and ends with the ultimately unsuccessful attempt to revive Vargas around 7:08 p.m. Thus, the events in question spanned approximately fifty minutes. The camera angle shows the back of the SUV for the bulk of the footage, until the SUV drives off at approximately 6:56 p.m.

Events unfolded as follows. At approximately 6:20 p.m., Auburn Police stopped the green SUV, and at approximately 6:22 p.m., police asked its driver to turn off the vehicle. The driver—later identified as Vargas—produced a Washington driver's license, as well as an Oregon license, neither of

ORDER – 2

which was in his real name. The driver denied that his name was Chris, and he stated that he could not produce the registration for the green SUV. However, he did say that he lived in Federal Way. In an effort to positively identify the driver before making an arrest, detectives arranged for their informant Ms. Simpson to participate in a drive-by viewing of the driver. Detectives drove her to the scene in a van, arriving at approximately 6:55 p.m. The video shows that one detective stood in front of the vehicle shining a flashlight on the driver's face. Additional detectives were on either side of the vehicle. On the driver's side stood Auburn Police Officer Ashbaugh, who instructed the driver to look toward him and the van that was about to drive by for the identification. As the van approached, a fourth, fifth, and sixth detective approached the car and can be seen in the video. The van containing Ms. Simpson slowed down and paused next to the green SUV and then departed. The detectives on the scene then walked around the vehicle as the detectives accompanying Ms. Simpson contacted them to communicate that Ms. Simpson had positively identified the driver as "Chris," her drug supplier.

Immediately after the van departed, Vargas started the engine of the SUV. The sound of the engine starting corresponds with the police video camera's clock reading of 18:56:05. When the engine started, four detectives were standing on the driver's side, one was standing on the passenger's side, and one was standing at the left front corner of the vehicle, alternately viewable and hidden by the SUV and the others standing near the vehicle. All parties agree that the detective at the left front corner of the vehicle was Defendant Faini. However, it is not clear from the video whether any part of his body was directly in front of the vehicle or if he was entirely to the side of the vehicle when the engine started.

During the next seconds, several things happened. Upon the engine starting, the four detectives clearly on the driver's side of the vehicle all reached for the open window. Two or three detectives close enough to plunge their hands inside the vehicle did so in an apparent attempt to reach for the keys in the ignition. Defendants assert that Vargas was panicked and violently fought them off as he tried to get the SUV into gear. Plaintiff does not dispute this, but she does assert that she personally did nothing to threaten the officers. Defendant Faini drew his gun and pointed it at Vargas at 18:56:06. The video

ORDER – 3

shows that when he drew his gun, he was at least partially to the side of the vehicle. He then moved toward a position in front of the car, disappearing from the camera's view.

Someone yelled an inaudible command at 18:56:07. At 18:56:08 the vehicle accelerated forward,[2] another inaudible command was given, and then the first of three shots was fired. The video shows that at the time the first shot was fired, the detectives still had their hands inside the vehicle.[3] All parties agree that Defendant Faini fired the shots. Defendant Faini is not visible in the video when the first shot is heard. Further, it is unclear from the video precisely where Defendant Faini was standing in relation to the vehicle, because the four detectives in the foreground block that view. The detectives on the driver's side jumped back as the vehicle continued to accelerate and Defendant Faini fired two more shots. As he fired these two shots, Defendant Faini is partially visible in the video at the far end of the group jumping back away from the vehicle. The third shot was fired as the recorder clock hit 18:56:09. The vehicle's tires squeaked as it continued to accelerate, hit the curb, and turned to the left. By 18:56:10, the vehicle was driving away from the cluster of detectives.

By 18:56:16, the SUV had sped away, rounded a bend, and was no longer in the camera's view. At 18:56:19, the police car with the video camera began a short chase, which ended when the green SUV came back into view approximately fifteen seconds later, stopped on the left-hand side of the road, with Plaintiff exiting. Two of Defendant Faini's shots had hit Vargas, and after being removed from the vehicle and attended to medically, he was pronounced dead at the scene. One of Defendant Faini's shots struck Plaintiff in the abdomen.

While the video depicts a clear chain of events, some specific facts remain unclear from the video alone. Most disputed is Defendant Faini's exact position when he fired the shots, particularly the first

---

[2] While the speed of the vehicle is not known or specifically addressed by the parties, it is clear from the video footage that the SUV was not simply rolling or idling. Rather, it accelerated out of its parked position and continued to do so.

[3] Plaintiff's assertion to the contrary (Dkt. No. 31, at 20) is directly contradicted by the video.

ORDER – 4

shot. The parties strenuously dispute whether he was actually in the path of the accelerating vehicle—and thus whether he was in any personal danger. Plaintiff insists that the shots were fired from the side of the vehicle, rather than the front. In support, they refer to the medical examiner's inquest testimony that both shots that hit Vargas appeared to enter his body from left to right. Additionally, Defendants assert that Defendant Faini's foot was being run over when he fired. However, Plaintiffs dispute this, citing inquest testimony of a witness who said he never saw Defendant Faini get hit by the SUV and evidence that the boots he was wearing were not marked, scratched, or dented as if they had been run over. (Dkt. No. 32 (Muenster Decl. Exhs. D, M.) For purposes of this motion, the Court must take Plaintiff's version of these disputed facts as true.

**II.    Analysis[4]**

    **A.    Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions, and provides in relevant part, that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable fact-finder to find for the non-moving party. *Anderson*, 477 U.S. at 248. The moving party bears the burden of showing that there is no evidence which supports an element essential to the non-movant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In order to defeat a

---

[4] As a preliminary matter, the Court notes that Plaintiff filed a Motion for Extension of Time (Dkt. No. 34) to respond to Defendant's motion. Defendants did not oppose this motion. Plaintiff's motion is GRANTED.

ORDER – 5

motion for summary judgment, the non-moving party must make more than conclusory allegations, speculations or argumentative assertions that material facts are in dispute. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994).

### B. Excessive Force Claim

To state a claim under 42 U.S.C. § 1983, Plaintiffs must establish (1) "depriv[ation] of a right secured by the Constitution or laws of the United States" and (2) that "the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). No party disputes the existence of the second element—both Defendants Faini and the City of Auburn are "state actors" for purposes of § 1983. Thus, the Court moves on to discuss the relevant alleged deprivation of Vargas's federal rights and Defendant Faini's claim of qualified immunity.

In the context of "government officials performing discretionary functions," as here, such officials "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This "qualified immunity" is determined in two steps. First, the Court must consider the threshold question of whether, taken in the light most favorable to Plaintiffs, the facts alleged show that "the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Supreme Court has specified that:

> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.

*Id.* The second step requires evaluation of the law in the "specific context of the case." *Id.* Accordingly, this Court must determine (1) whether Plaintiffs' facts, as alleged, could show violation of a constitutional right, and, if so, (2) whether such right was "clearly established" at the time of the incident.

Plaintiff's First and Second Causes of Action appear to attempt to remedy the same injuries via two different constitutional vehicles—the Fourth and Fourteenth Amendments. The Supreme Court has

ORDER – 6

indicated that when analyzing an excessive force claim, "analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 842-43 (1998). Where the claim "arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, [not the Fourteenth Amendment]." *Graham*, 490 U.S. at 394. Since Plaintiff's First and Second Causes of Action rely on the same nexus of facts and allegation of excessive force, they are properly considered under the Fourth Amendment's "objective reasonableness" standard, as opposed to a Fourteenth Amendment substantive due process standard. *Id.* at 388.

The inquiry as to whether Defendants violated Plaintiff's Fourth Amendment rights proceeds in two steps. First, it must be determined whether a "seizure" occurred. A Fourth Amendment seizure occurs when there is a "governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (emphasis omitted). Second, if there was such a seizure, it must be determined whether Defendant's actions were objectively reasonable. *Scott*, 127 S. Ct. at 1776. The reasonableness determination "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotations omitted). The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The "reasonableness" inquiry is objective and does not take into account the officer's "underlying intent or motivation." *Id.* at 397.

Defendants argue that no Fourth Amendment seizure occurred here, because Defendant Faini intended to shoot Vargas, not Plaintiff. In support of their argument, Defendants rely primarily on *Brower v. County of Inyo* and *Sacramento v. Lewis*. The Court is not persuaded by Defendants' argument. *Brower* discussed whether a seizure occurred where a suspect who had been fleeing police at high speeds in a stolen car crashed into a police roadblock, causing his death. 489 U.S. at 594. The

ORDER – 7

Court of Appeals had concluded that no seizure occurred, reasoning that the situation was analogous to that of a police chase in which the suspect unexpectedly loses control of his car and crashes, which has been held not to be a seizure. *Id.* at 595. The Supreme Court distinguished that situation, reasoning that because the suspect was "stopped by the very instrumentality set in motion . . . to achieve that result," a seizure had occurred. In so concluding, the Court noted that "[a] seizure occurs even when an *unintended person* or thing is the object of the detention or taking." *Id.* at 596 (emphasis added). Since Plaintiff indisputably was not the intended target of Defendant Faini's fire, *Brower* expressly rejects Defendants' position that no seizure occurred.[5]

The Court analyzed a situation that is factually analogous to the present case in *Tubar v. Clift*, 453 F. Supp. 2d 1252 (W.D. Wash. 2006), and concluded that a seizure had occurred. In that case, an officer fired at a car, intending to hit its driver but instead wounding its passenger. This Court restated the central rule established in *Brower* as follows: "The fundamental characteristic of conduct giving rise to a seizure is that the means of harm is connected to an intentional act by the police that is done with the expectation that such harm will occur." *Tubar v. Clift*, 453 F. Supp. 2d 1252 (W.D. Wash. 2006). Because the officer had intentionally fired at the car, with the expectation that harm would occur, that an unintended person was injured was irrelevant to the question of whether a seizure occurred.

Given *Brower*'s focus on the intentionality of the means, rather than the specific result, and the specifically applicable *Tubar* case, it is not difficult to conclude that a seizure took place in the present case. Though Defendant Faini was attempting to shoot Vargas, who was propelling the car, he intentionally applied the means by which Plaintiff was wounded. Accordingly, a seizure occurred here.

---

[5] Likewise, *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), does not support Defendants' argument that no seizure occurred because Plaintiff was not the target of Defendant Faini's fire. In *Sacramento*, a high speed chase resulted in a police car unintentionally striking the passenger on a motorcycle after its driver lost control. The Court applied *Brower* in holding that no seizure had occurred in that case. *Sacramento* can be distinguished from the present case based on the intentionality of the means–whereas in the present case, Defendant Faini intended to fire the shot that injured Plaintiff, in *Sacramento*, the officer did not intend to stop the motorcycle by crashing into it.

ORDER – 8

The next step in the Court's inquiry is to assess whether Defendant Faini's actions were objectively reasonable. The Court has already made that assessment in the action in which Vargas's Estate sought damages under § 1983, alleging, among other things, excessive force under the Fourth Amendment. The Court concluded that the Defendants were entitled to summary judgment, because Defendant Faini's actions were objectively reasonable. *Estate of Vargas Mendoza v. City of Auburn*, C06-0455-JCC (W.D. Wash. Feb. 22, 2007). In so concluding, this Court relied on the danger faced by the other officers on the scene, two of whom had thrust their arms into the SUV in an attempt to prevent Vargas from fleeing the scene. This calculus does not change in the present context, where it is the passenger of the vehicle challenging the use of force, when there has been no allegation that the shooting of Plaintiff was anything but an unintended consequence of the lawful application of deadly force designed to stop Vargas. The keystone of this analysis is still whether Defendant Faini's conduct was objectively reasonable under the circumstances. Having already concluded that it was, the Court rests on the reasonableness analysis contained in its prior order in the related *Vargas* case.[6] The shots fired by Defendant Faini were objectively reasonable, and no genuine issue of fact exists that would permit Plaintiff to show that her Fourth Amendment rights were violated.

Having concluded that Plaintiff has not alleged a viable claim of excessive force in violation of the Fourth Amendment, the Court need not reach the second prong of the qualified immunity analysis. Defendant Faini is entitled to qualified immunity on the Fourth Amendment issue. The Fourth Amendment claim against him in his official capacity, as well as any municipal liability claims against the City of Auburn stemming from the alleged Fourth Amendment violation are hereby DISMISSED.

---

[6] In the present case, Plaintiff makes one assertion that was not made in the *Vargas* case: that the shots fired by Defendant Faini were without warning. Plaintiff notes that "if practicable, a police officer must issue a warning before using deadly force." *Jensen v. City of Oxnard*, 145 F.3d 1078, 1086 (9th Cir. 1998). The Court finds that the record "blatantly contradict[s]" Plaintiff's assertion that no warning was given. *Scott*, 127 S. Ct. at 1776. The video shows that two indecipherable commands were given before the shots were fired. Moreover, the rapidity of the unfolding events would make any more specific command impracticable. Thus, Plaintiff cannot prevail on this theory.

ORDER – 9

### III. Conclusion

Plaintiff's Motion for an Extension of Time (Dkt. No. 34) is GRANTED.

Defendant's Motion for Partial Summary Judgment (Dkt. No. 21) is hereby GRANTED. Defendant Faini is entitled to qualified immunity on the Fourth Amendment claim. The Fourth Amendment claim against Defendant Faini in his official capacity, as well as any municipal liability claims against the City of Auburn stemming from the alleged Fourth Amendment violation are hereby DISMISSED.

Plaintiff's brief indicates a desire to voluntarily dismiss her Third Cause of Action, which alleges a failure to immediately summon and provide medical care in violation of the Fourteenth Amendment. Accordingly, the Court hereby orders, pursuant to Federal Rule of Civil Procedure 41(a)(2), that this claim is DISMISSED, without costs to any party.

The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, which are hereby DISMISSED WITHOUT PREJUDICE, pursuant to 28 U.S.C. § 1367(c).

SO ORDERED this 9th day of July, 2007.

John C. Coughenour
United States District Judge

ORDER – 10